## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| KEITH ALLEN GREEN | : | |
| Petitioner | : | |
| v. | : | Civil Action No. DKC-07-1097 |
| NANCY L. ROUSE, *et al.* | : | |
| Respondents | : | |

o0o

## <u>MEMORANDUM OPINION</u>

Before the court is a Petition for Writ of Habeas Corpus filed April 30, 2007, by Maryland prisoner Keith Allen Green (Paper No. 1), the State's Answer and exhibits filed in response thereto (Paper No. 21) and Green's reply.  Paper No. 24.  After reviewing these papers, the court finds no need for an evidentiary hearing.  *See* Rule 8(a), <u>Rules Governing Section 2254 Cases in the United States District Courts</u>; *see also* 28 U.S.C. § 2254(e)(2).  For reasons set forth below, the court denies relief and dismisses the Petition with prejudice.

## <u>The Crime</u>

The facts adduced at trial and summarized by the appellate court on direct appeal follow:

> On February 19, 1997, the victim, thirteen-year-old Claudia Pickeral, was murdered in Longview Beach in St. Mary's County.  When she was found, her clothes were disheveled, her blouse was open exposing her breast, the button of her jeans was undone, and her boots were missing.  According to Dr. Theodore King, an assistant medical examiner who testified at Green's trial, Claudia had been strangled to death.  She had scrapes and bruises on her head and scrapes on her chest, indicating that a struggle had occurred.

> At trial, Harriett Johnson testified that, on February 19, 1997, while driving in the Longview Beach area with Benjamin Allen, she saw a light brown-skinned male, approximately 5'7" to 5'9" tall, weighing 195 to 200 pounds, wearing red sweats and a white T-shirt, "dragging something or a person across the road."  Mr. Allen backed the car up and drove down the street to where Ms. Johnson had seen the person.  Ms. Johnson stated that the person saw them coming and dropped a child

onto the ground.  They went to a nearby house to call the police, which happened to be Claudia's house.  Ms. Johnson was unable to make an identification from a photograph presented to her at trial.

Claudia's mother, Claudia Thompson ("Mrs. Thompson"), testified that her daughter, Claudia, usually took the school bus home from school.  The bus would drop her off between 3:25 and 3:30 p.m.  Mrs. Thompson usually gets off work at 3:30 p.m.  On February 19, 1997, Mrs. Thompson rushed home to pick up Claudia so they could go to [the] hospital to see Mrs. Thompson's father, who had suffered a stroke that day.  She testified she got home at 3:40 or 3:45 p.m., but Claudia was not at home.  Because Mrs. Thompson did not have a telephone, she used her next door neighbor's phone.  After Mrs. Thompson made some phone calls looking for her daughter, Ms. Johnson approached her and asked to use the phone because somebody was dragging a young girl's body.  After calling the police, Mrs. Thompson went looking for Claudia.

Robin Lindsey, a neighbor whom Mrs. Thompson had called when she was looking for Claudia, drove around looking for Claudia and found her lying on the ground in the driveway of a neighbor's home.  Ms. Lindsey testified that Claudia had dirt drag marks on her socks and trousers.  Ms. Lindsey performed CPR on Claudia and felt a faint heartbeat that "would start coming and going."

Ms. Lindsey told the officer who arrived on the scene that she saw a light blue car "in the area that was speeding, [but] not away from the scene."

The appellant, Green, lived next door to Claudia's family.  Claudia's stepfather, Michael Thompson, testified that he saw Green wearing a white shirt and red sweat pants the day before Claudia's death.  On the day of the murder, Mr. Thompson testified that he left work early after receiving a phone call notifying him that his father-in-law had suffered a stroke.  He went to the hospital to visit his father-in-law, and then visited with his family before arriving at the crime scene and learning of Claudia's death.  A tow truck driver, Wayne Thomas, testified that he saw Green wearing a white shirt, red sweat pants, and Timberland boots the day before Claudia's death, and described the attire as Green's "motif."

Deputy Sheriff William Bell testified that he found Claudia's boots later in the day in a nearby grove of trees.  He also found, in some moss, two distinct drag marks that forms a straight line to where Claudia's body was found.  Green asked Deputy Sheriff Bell to search his garage and shed area because "[he] was concerned whoever had committed this crime may be hiding in his garage." Deputy Sheriff Bell responded that no one could be hiding in the garage because "they were observed running in the other direction."

The day after the murder, on February 20, 1997, Detective Ernest Carter[1] went to Longview Beach to investigate the murder and saw Green near a "burn pile" near Green's property. Deputy Sheriff Kevin Somerville testified that he inspected the burn pile on the day of the murder and did not notice anything other than burned trash. However, the next morning, some of Claudia's personal belongings, including letters, an ink pen her sister had given her, a bookmark, a calendar, and a hairpiece, were found in the burn pile. Despite a heavy dew that morning, the items were dry, leading the crime lab technician to            conclude that they had not been there very long. The items were fingerprinted and, of the 17 fingerprints detected, 11 were found to be Claudia's fingerprints. Green's fingerprints were not found on any of the items.

---

[1] Detective Carter was taken off the case on February 21, 1997, because his wife is Michael Thompson's aunt.

Detective Carter also testified that Green told him that, at about 2:30 on the afternoon of the murder, Audra Hill and Joseph Carter picked him up to go to a liquor store. When they returned, ambulances and the police were already in the area. However, during trial, Hill and Carter testified that they did not go to the liquor store with Green on the day of the murder, although they did stop by Green's house at 5:30 or 6:00 p.m.

Detective Carter also testified that, as an investigative technique, he told Green that Claudia had made a tape recorded statement before dying and that it was being sent to the FBI for enhancement. He stated that, on February 25, 1997, Green approached him and asked if he was the suspect in the case, and, without saying he was involved, asked how much time he would get if he were involved. Detective Carter said Green was "very nervous, very confused, very nervous," and he responded that if Green had something on his mind, they should talk. However, the next morning, Green said he had no additional information that would help with the investigation.

Charles Proctor testified that, on February 27, 1997, he was sitting in the passenger seat of a neighbor's car in front of a store when Green approached the car. Green asked who the witnesses were who saw Claudia being pulled across the road and whether Claudia was alive when the ambulance arrived. Proctor testified that Green then said that the name Claudia called out on the tape "Could have been my name, because I could have been the last one that seen [sic] her."

Special Agent Carl Pearsall testified that he spoke with Green on February 28, 1998, while in plain clothes. According to Pearsall's testimony, Green said, "I know they are watching me, so I have to watch out. They do not have anything on me, because they have not charged me. If I just keep holding on, I will be okay. I was close to giving up. The police offered me a deal. If they said it was an accident, I

would only get 30 years. [But if] I was convicted of murder, I would        get life. I was just about to give in and take the deal....It's been over a year and they don't have anything on me....The problem with the case is they cannot find        t h e bookbag or jacket." On cross-examination, Special Agent Pearsall stated that the report of Green's alleged statements says that Green also said, " I had nothing to do with the murder."

On September 8, 1998, Thomas Young gave a written and signed statement, indicating that about a week after the murder, he was riding around with Green and Craig Queen when Green said "that he was hi [sic] on drugs and his dick got hard and that he wanted to have sex and know [sic] one was around and then he saw Claudia coming and decides to try to hand at her..." and that "she put up a fight when he made his move." Young's written statement also said that on another occasion, Green told him, "I mays will [sic] just say I did it...Maybe they will leave [my wife] Leslie and the kids alone." Young's statement, which was made while he was in custody for perjury charges for testifying to the Grand Jury that Green made no statements to him, explained that he lied to the Grand Jury because he "did not want people in the street thinking I was a snitch to the police, and I didn't want Keith's family mad at me." At trial, Young recanted his written statement and testified that Green did not make any statements to him regarding Claudia's murder.

Captain Steven Doolan testified that, on November 1, 1997, Young was arrested for driving while suspended. Young handed Captain Doolan a piece of paper that said,"He [Green] told me he did it." Captain Doolan further stated that Young pointed out the location of Claudia's bookbag and jacket. Young was released from custody after making the oral statements. The next day, Young told Captain Doolan that he "must have misunderstood me. I never said that."

Sergeant Lyle Long testified that Young made oral statements to him on November 1, 1997 that were consistent with his subsequent written statement. However, on November 2, 1997, Young recanted his oral statements and it was "just a hypothetical statement."

Green called three witnesses in his defense. Natia Hall, a fourteen-year-old who went to school with Claudia, testified that she saw a light blue car driving out of Longview Beach on the day of the murder. Her sister, Marquita Hall, testified that she also saw a light blue car with tinted windows and chrome wheels driving fast at the same time the ambulance was coming into the area. Lieutenant John Horne testified that Green voluntarily went to the Sheriff's Office and made a written statement that, on the day of the murder, his wife called him at about 1:55 p.m.[2] Lieutenant Horne also testified that Green voluntarily provided hair samples to the crime lab technician and that there was information that a William Kuykendall was seen in the area at the time of the murder. Lieutenant Horne interviewed Kuykendall in November 1997, who stated he was in school all day on the day of Claudia's

murder.  On January 7, 1998, the assistant principal at Kuykendall's school told Lieutenant Horne that Kuykendall was not in school on the day of the murder. Lieutenant Horne did not re-interview Kuykendall.  On cross-examination, Lieutenant Horne testified that a school employee told him that students who missed homeroom would have been marked absent for the entire day.

_____

[2] Laura Smith testified that on the day of the murder, she traveled with Green's wife, Leslie, from their job at Patuxent River, Maryland, to Frederick, Maryland.  They left work between noon at 2 p.m. and did not return to St. Mary's County until about 10:00 p.m.  During the trip, Smith testified that Leslie did not make any phone calls in her presence.

  The State called Kuykendall's grandmother as a rebuttal witness, who testified that she picked Kuykendall up from school at about 2:30 p.m. on February 19, 1997, and drove to Ms. Mowlin's house in Longview Beach, where they stayed inside the house until after 10:00 p.m.

Paper 21, Exhibit 8 at 1-8.  On August 18, 1999, Green was convicted by a jury in the Circuit Court for Prince George's County[1] of second-degree murder in the death of thirteen-year-old Claudia Pickeral.[2]  Paper No. 21, Exhibit 1 at 5 and Exhibit 4 at 3-116.  He was subsequently sentenced to thirty years incarceration.  *Id.,* Exhibit 1 at 7 and Exhibit 5 at 1-11.

## **Procedural History**

On appeal, Green argued that (1) the trial court erred in failing to question a juror who had indicated the potential for bias or prejudice during trial, and (2) the evidence was insufficient to prove guilt beyond a reasonable doubt.  *Id.*, Exhibit 6.  On July 13, 2000, the Court of Special Appeals affirmed Green's convictions in an unreported opinion, finding both claims not preserved for appellate review and also finding the evidence sufficient to sustain the conviction. *Id.*, Exhibit 8 at 9, 11-12.  His pro se request for certiorari review of both claims was denied on October 13, 2000. *Id.*, Exhibits 9 and 10.

_____

[1] The crime occurred in St. Mary's County, but the case was removed to Prince George's County.

[2] The jury acquitted Green of first-degree murder.  *Id.*

On March 31, 2003,[3] Green initiated post-conviction proceedings in the Circuit Court for Prince George's County, *Id.*, Exhibits 1 and 11 . The Petition, as supplemented, included claims that trial counsel was ineffective for:

1.      laboring under a conflict of interest;

2.      failing to file a motion in limine to prevent Thomas Young from testifying;

3.      failing to move to strike the testimony of Thomas Young, move for a mistrial, or take any other corrective action to minimize prejudice;

4.      failing to object to the court's handling of the juror who indicated possible bias and prejudice;

5.      failing to move for acquittal at the close of all the evidence;

6.      failing to interview or call expert, fact or character witnesses;

7.      failing to investigate other suspects;

8.      failing to impeach Thomas Young with prior convictions;

9.      failing to adequately cross-examine police witnesses;

10.     failing to consult with Green;

11.     failing to call Green to testify at trial;

12.     failing to advocate;

13.     failing to file post-sentencing motions for reconsideration and three-judge panel review of sentence; and

14.     failing to object to the jury instructions and entering of the guilty verdict on second-degree murder.

Green also alleged (15) an impermissible cumulative effect caused by counsel's deficiencies; (16) that his conviction was obtained through the State's knowing use of Thomas Young's perjured

---

[3]Green's initial post-conviction petition, filed on August 28, 2001, was withdrawn on January 6, 2003.

testimony; (17) the conviction constituted double jeopardy; (18) he was denied the right to be present at a bench conference concerning a potentially biased juror; (19) the trial court erred by instructing the jury that its instructions on the law were binding on the jury; and (20) the trial court abused its discretion by telling the jury that it could not review evidence or testimony.  *Id.*, Exhibits 11 at 3-8 and 12 at 1-2.  Following a hearing, the post-conviction court granted Green's request to file a belated motion for reconsideration of sentence and an application for review of sentence[4] and otherwise denied relief in an opinion dated April 7, 2006.  *Id.*, Exhibits 1 and 14

Green, through counsel, filed a timely application for leave to appeal the post-conviction decision, alleging that trial counsel was ineffective (1) for not ensuring his presence at the trial court's questioning of a juror concerning possible bias, (2) for failing to move to strike the juror or seek a mistrial, and (3) by failing to notify potential mitigation witnesses of the correct start time for his sentencing.  *Id.*, Exhibit 15 at 4.  Leave to appeal was summarily denied by the Court of Special Appeals on March 12, 2007.  *Id.*, Exhibit 16.

Green now raises the following claims in support of his federal habeas corpus petition:

(1)     He was denied effective assistance of counsel where trial counsel "failed to preserve a claim that would have had a substantial possibility of resulting in a reversal of my Petition for Post Conviction;"[5]

(2)     There was a "[f]ailure to ensure [Green's] presence at the trial court's questioning" of a juror; and

(3)     The trial court erred in "not questioning a potential juror for bias and prejudice" and in failing to mention during voir dire the age of the victim.

---

[4] The motion and the application were denied on August 21, 2006.  *Id.*, Exhibit 1 at 16.

[5] Petitioner does not specify a factual basis for this claim.  To the extent he complains of ineffective assistance of post-conviction counsel, such claim is not ordinarily cognizable as a basis for relief under 28 U.S.C. § 2254.  *See Mackall v. Angelone*, 131 F.3d 442, 447-48 (4th Cir. 1997) (en banc) (post-conviction relief is not part of the criminal proceeding itself and not constitutionally required).

Paper No. 1 at 6 and Supplemental Memorandum, Paper No. 24 at 2.

## Threshold Considerations

## Exhaustion of State Remedies

Under *Rose v. Lundy*, 455 U.S. 509 (1982), those petitioning for federal habeas corpus relief must first exhaust each claim by pursuing remedies available in state court. This exhaustion requirement is satisfied by seeking review of the claim in the highest state court with jurisdiction to consider the claim. *See* 28 U.S.C. §§ 2254(b)-( c); *see also O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999); *Gray v. Netherland*, 518 U.S. 152, 162-63 (1996). In Maryland, this may be accomplished by proceeding with certain claims on direct appeal (and thereafter seeking *certiorari* to the Court of Appeals) and with other claims by way of a post-conviction petition, followed by petitioning the Court of Special Appeals for leave to appeal. Green no longer has any state direct review or collateral review remedies available to him with respect to the claims raised in this court. Thus, his claims will be considered exhausted for the purpose of federal habeas corpus review.

## Procedural Default

Where a petitioner has failed to present a claim to the highest state court with jurisdiction to hear it, whether it be by failing to raise the claim in post-conviction proceedings or on direct appeal or by failing to timely note an appeal, the procedural default doctrine applies. *See Coleman v. Thompson*, 501 U. S. 722, 749-50 (failure to note timely appeal); *Murray v. Carrier*, 477 U. S. 478 (1986) (failure to raise claim on direct appeal); *Murch v. Mottram*, 409 U. S. 41, 46 (1972) (failure to raise claim during post conviction); *Bradley v. Davis*, 551 F. Supp. 479, 481 (D. Md. 1982) (failure to seek leave to appeal denial of post-conviction relief). Thus, claims which have never been presented in the state courts--or claims which were not exhausted properly in the state courts–will

not be examined on the merits if review of the claims in state court would be barred by state procedural rules.  *See Johnson v. Maryland*, 915 F.2d 892, 895 (4th Cir. 1990).

The bar, however, is not absolute.  In *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977), the Supreme Court held that consideration of a claim in a petition for habeas corpus can be barred by failure to comply with state procedural rules, unless the petitioner makes a showing of cause for the failure and prejudice resulting from the failure.  *See also Murray*, 477 U.S. at 495; *Engle v. Isaac*, 456 U.S. 107, 129 (1982).

Even if a petitioner cannot show cause and prejudice to excuse procedural default, a court must still consider whether it should reach the merits of the petitioner's claims.  To that end, in an effort to "balance the societal interests in finality, comity, and conservation of scarce judicial resources with the individual interest in justice that arises in the extraordinary case," *Schlup*, 513 U.S., at 324, 115 S.Ct. 851, the Supreme Court has recognized a miscarriage-of-justice exception.  Thus, in appropriate cases, "the principles of comity and finality that inform the concepts of cause and prejudice 'must yield to the imperative of correcting a fundamentally unjust incarceration.' " *House v. Bell*,  547 U.S. 518, 536 (2006), citing *Murray, supra*, at 495 (quoting *Engle*, supra, at 135, ).  This miscarriage of justice standard is directly linked to innocence.  *Schlup*, 513 U.S. at 320.  Innocence is not an independent claim; rather, it is the "gateway" through which a petitioner must pass before a court may consider constitutional claims which are defaulted.  *Id*. at 315.  The miscarriage of justice exception applies where a petitioner shows that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray*,  477 U. S. at 496.

### Standard of Review

Title 28 § 2254(d) provides that:

[a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

In *Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997), the Supreme Court characterized

§ 2254(d) as a "highly deferential standard for evaluating state court rulings." In *Williams v. Taylor*,

529 U.S. 362, 407-08 (2000), Justice O'Connor, speaking for the majority, further elucidated:

Section 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court. Under Section 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied -- the state-court adjudication resulted in a decision that (1) "was contrary to...clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of...clearly established Federal law, as determined by the Supreme Court of the United States." Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Id.* at 412-413. Justice O'Connor indicated that "the phrase 'clearly established Federal law, as

determined by the Supreme Court of the United States'...refers to the holdings, as opposed to the

dicta, of th[e] Court's decisions as of the time of the relevant state-court decision." *Id.* at 412.

Furthermore, she indicated that:

> [u]nder Section 2254(d)(1)'s 'unreasonable application clause...a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable.

*Id*. at 411.  In other words, "a federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable."  *Id*. at 410.   A state court decision involves an "unreasonable application" of Supreme Court precedent if the court "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case," *id*. at 407-08, or "was unreasonable in refusing to extend the governing legal principle to a context in which the principle should have controlled."  *Ramdass v. Angelone*, 530 U.S. 156, 166 (2000); *see also Booth v. Nuth*, 288 F.3d 571 (2002).[6]

The Court reaffirmed and applied these standards in an ineffective assistance of counsel context in *Bell v. Cone*, 535 U.S.685 (2002).   It explained:

> For respondent to succeed, however, he must do more than show that he would have satisfied *Strickland's* test if his claim were being analyzed in the first instance, because under § 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied *Strickland* incorrectly. See *Williams*, supra, at 411.   Rather, he must show [the state court] applied *Strickland* to the facts of his case in an objectively unreasonable manner.

*Id*. at 698-9.

---

[6]A decision is contrary to the Supreme Court's clearly established precedents if the state court applied a rule that contradicts the governing law set forth in the Court's cases, or if it confronted a set of facts that is materially indistinguishable from a decision of the Court but reached a different result. *See Brown v. Payton*, 544 U.S. 133, 141 (2005). A decision constitutes an unreasonable application of the Court's clearly established precedents if the state court applied the Court's precedents to the facts in an objectively unreasonable manner. *Id.* In reviewing a habeas petition, federal courts must presume the correctness of a state court's factual determinations unless the habeas petitioner rebuts the presumption of correctness by clear and convincing evidence.  *See* 28 U.S.C. § 2254(e)(1).

"The federal habeas statute dictates a highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt. The required deference encompasses both the state court's legal conclusions and its factual findings." *Lenz v. Washington,* 444 F.3d 295, 299 (4th Cir. 2006) (internal quotation marks and citation omitted). Thus, where the state court has adjudicated a claim on the merits, federal habeas relief is appropriate only if the state court's judgment resulted in a decision that is "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *see also Green v. Johnson*, 515 F.3d 290 (4th Cir. 2008).

In reviewing Green's attack on his state court conviction, the court presumes that factual determinations made by the state court are correct.  Green bears the burden of rebutting this presumption of correctness by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1).  With these standards in mind, the court shall consider Green's claims.

## Ineffective Assistance of Trial Counsel[7]

To establish a claim of ineffective assistance of trial counsel, Green must show that "counsel's representation fell below an objective standard of reasonableness" and "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *See Strickland v. Washington*, 466 U.S. 668, 694 (1984).  With regard to the first prong, this court "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id*. at 690.  All circumstances are to be considered, and this court's scrutiny of counsel's conduct must be "highly deferential." *Id*. at 688-89.  Even if counsel committed a professionally unreasonable error, relief can be granted only if  "counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *See Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993).

The court has construed Green's first allegation that "[c]ounsel failed to preserve a claim" to mirror a claim Green made in post-conviction**,** that trial counsel failed to move for acquittal at the close of the evidence,[8] thus precluding appellate review of the sufficiency of the evidence on direct appeal.[9]  The post-conviction court noted that while trial counsel does have a duty to make a motion for judgment of acquittal, the failure to do so is not error unless it is shown that the motion has merit. The court went on to conclude that "[u]pon review of the record in this case, this Court, as did the

---

[7] The claims presented in this Petition are not a model of clarity.  In his first claim, Green may be asserting ineffective assistance of post-conviction counsel.  Defects in collateral proceedings are not a basis for federal habeas corpus relief. *See Wright v. Angelone*, 151 F.3d 151, 158 (4th Cir. 1998) (citing *Bryant v. Maryland*, 848 F.2d 492, 493 (4th Cir. 1988)).  To the extent that Green intends to seek reversal of his conviction based on the assistance of post-conviction counsel, his claim fails.

[8] Paper No. 21, Exhibit 13 at 81-82.

[9] Paper No. 21, Exhibit 8 at 12.

Court of Special Appeals, finds that such motion had no merit and therefore, trial counsel's performance was not deficient."  Paper No. 21, Exhibit 14 at 11.  This finding is presumptively correct under 28 U.S.C. § 2254(e)(1) and is supported by the record.  Green is not entitled to relief on this claim.

In his second claim, Green argues ineffective assistance due to counsel's failure to ensure Green's presence when the trial court questioned juror Higgins "about potential bias."  Paper No. 1 at 6.  The post-conviction court noted that a defendant is entitled under state law to be present at bench conferences concerning juror disqualification, but that the right may be waived if the defendant does not affirmatively ask to be present or does not express an objection at the time, and if his attorney consents to the defendant's absence or says nothing regarding the matter.  Paper No. 21, Exhibit 14 at. 4.  The court then noted the colloquy between the court, the bailiff, and Ms. Higgins, and found that the right of confrontation was not offended, noting that as Ms. Higgins was a juror and not a witness, and that Green's "right" to be present was not constitutional in nature and thus required "knowing and intelligent waiver."  The post-conviction court went on to examine whether counsel was ineffective in failing to object during the colloquy, and found that:

> [w]here counsel has a valid tactical reason for his actions, his actions do not constitute ineffective assistance of counsel. [Citation omitted].  In order for an action to qualify as a sound trial tactic, three requirements must be met: (1) the action was intentional (2) it was reasonable for trial counsel to have believed that the action would produce the desired objective and (3) the objective was worthwhile.

> Trial counsel testified at Petitioner's post conviction hearing that he found Juror Higgins' comment regarding her concern for the case to be disingenuous and that it behooved the defendant to allow her to remain on the jury in lieu of seating the first alternate.  (Post Conviction Hrg. Transcr. Pp. 66-67).  Trial counsel stated that he informed the Petitioner of the substance of the bench conference and his thoughts on Juror Higgins to which the Defendant replied, "you're the attorney, you make the decisions."  (Post Conviction Hrg. Transcr. P. 68).  Based on the above, it is clear that trial counsel's inaction was intentional.  Furthermore, it is obvious that

-14-

> trial counsel was aware that his inaction would keep Judge Johnson from seating the
> first alternate, and that such an objective, in counsel's professional judgment, was
> worthwhile to the Petitioner. This Court finds that trial counsel's actions were not
> ineffective but rather, strong advocacy for a man accused of killing a child.

*Id.*, Exhibit 14 at 4-6. The findings of the post-conviction court are supported by the testimony at

the post-conviction hearing and survive scrutiny under 28 U.S.C. § 2254(d). Green has failed to

show that counsel's conduct was erroneous and that a reasonable probability exists that but for such

error the outcome of trial would have been different.

**Trial Court Error**

In his third claim, Green claims "[t]he [trial] [c]ourt err[ed] in not questioning a potential

juror for bias and prejudice." Paper No. 1 at 1, Ground Three. To support this claim, he indicated

that a juror, "Ms. Higgins, informed the [c]ourt that she had heard something about the case after

the trial had started.[10] She said at this point that she was very uncomfortable with the case now. The

---

[10]This is not entirely correct. The juror never stated on the record she had heard something about the case. The following conversation occurred following jury selection, instructions from the court, and opening statements from counsel:

> THE COURT:    Will the attorneys come up to the bench. Just the attorneys this time.....Mr. Bailiff, who is the juror?

> THE BAILIFF:    Higgins. She said she heard something about the trial.

> THE COURT:    Have her come up. Ms. Higgins, come up, please....What did you tell the bailiff?

> JUROR HIGGINS: Yes, sir. I'm so sorry, Judge, but I have three children who need to be arranged for to go to school for this week. This is my only week. As far as the case, I'm very uncomfortable with this case.

> THE COURT:    Ma'am, I'm sorry about your children and whatnot. No, ma'am, go back and have a seat. I thought it was something else. Go back and have a seat.

Paper No. 14, Exhibit 2 at 1-55.

Court did not ask any further questions as to what she heard, could she give a fair verdict, and why she feels uncomfortable."[11]  *Id.*

Trial counsel did not object to the trial court's determination that Ms. Higgins remain on the jury.    On direct appeal, the claim concerning the limited questioning of Higgins by the trial court was held not preserved for review.  Paper No. 21, Exhibit 8 at 9-10.  The claim is thus subject to the procedural default doctrine and, absent the exceptions delineated above, may be barred from further review.

Green points to trial counsel's failure to object as the cause for default.[12]  Paper No. 24 at 3.  Even if this court were to assume Green could meet the first prong of the procedural default doctrine by showing cause for default, he would not be entitled to have the claim considered, as he has failed to show prejudice resulting therefrom.  The record shows that while a bailiff believed Ms. Higgins had "overheard" something about the case, questioning by the trial judge revealed that her reservations about serving as a juror centered around her child care problems and general uneasiness about the nature of the crime.  Nothing in the record suggests that more extensive questioning of Ms. Higgins would have revealed a legally sufficient basis for her removal from the jury.  Green has failed to overcome the procedural bar; thus, all aspects of his third claim of trial court error with

---

[11]Green for the first time also alleges that the trial court erred during voir dire in failing to mention the age of the victim.  *Id.*  Consideration of this aspect of the third claim is clearly barred by the procedural default doctrine.

[12]Green did not establish that counsel's failure to object amounted to ineffective assistance.  Indeed, trial counsel testified at the post-conviction hearing that even though Ms. Higgins was reluctant to serve as a juror, counsel believed she would be more sympathetic to Green than the individuals chosen to serve as alternates jurors.  Paper 21, Ex. 13, at 68.

regard to questioning a juror for bias and failing to bring out the victim's age during voir dire[13] are procedurally defaulted and foreclosed from federal habeas review.

Based on the foregoing analysis, habeas corpus relief is denied.  A separate Order follows.


Date:   July 14, 2009                              /s/
                                          DEBORAH K. CHASANOW
                                          United States District Judge

---

[13]A transcript of the voir dire has not been provided.  Given that the issue of voir dire discussion of the victim's age is clearly defaulted, Respondents shall not be ordered to produce the transcript or explain its unavailability.